# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| NUVERRA ENVIRONMENTAL SOLUTIONS, INC., *et al.*, | : | Case No. 17-10949-KJC |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |
| | | |
| DAVID HARGREAVES, | : | Civ. No. 17-1024-RGA |
| Appellant, | : | |
| v. | : | |
| | : | |
| NUVERRA ENVIRONMENTAL SOLUTIONS, INC., *et al.*, | : | |
| | : | |
| Appellees. | : | |

## MEMORANDUM

Steven K. Kortanek, Esq., Drinker Biddle & Reath LLP, Wilmington, DE; James H. Millar, Esq. (argued), Clay J. Pierce, Esq., and Stacy A. Lutkus, Esq., Drinker Biddle & Reath LLP, New York, NY, attorneys for Appellant David Hargreaves.

Pauline K. Morgan, Esq., Kenneth J. Enos, Esq., and Jaime Luton Chapman, Esq., Young Conaway Stargatt & Taylor, LLP, Wilmington, DE; Frederic Sosnick, Esq. (argued), and Sara Coelho, Esq., Shearman & Sterling LLP, New York, NY, attorneys for Appellees, Reorganized Debtors.

August 21, 2018



**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Presently before the Court is the appeal (D.I. 1) of David Hargreaves with respect to the

Bankruptcy Court's Order Confirming the Amended Prepackaged Plans of Reorganization of

Nuverra Environmental Solutions, Inc. and its Affiliated Debtors, dated July 25, 2017 (B.D.I. 366)[1]

("Confirmation Order"). The merits of the appeal are fully briefed. Also before the Court is the

Reorganized Debtors' motion to dismiss the appeal (D.I. 31) ("Motion to Dismiss") on the basis of

equitable mootness. For the reasons set forth below, the appeal meets the criteria for equitable

mootness, and the Court rules in the alternative that the Confirmation Order is affirmed.

## I.    BACKGROUND

The appeal arises from Debtors' plan of reorganization, pursuant to which secured creditors,

who would not receive 100% recovery on their secured claims, made a gift to general unsecured

creditors, who would otherwise receive no distribution under the Bankruptcy Code's priority

scheme, in order to enable the Debtors to reorganize. Even though unsecured creditors would

receive no distribution absent the gift, Appellant has appealed the Confirmation Order based on the

fact that the plan placed general unsecured claims of the same priority into separate classes and

provided disparate treatment.

The relevant facts are uncontested. In the months leading up to the bankruptcy filing,

Debtors struggled with liquidity and negotiated with certain creditors toward a prepackaged plan of

reorganization. On April 28, 2017, Debtors commenced a prepetition solicitation of votes on the

negotiated plan. (*See* B.D.I. 14). On May 1, 2017, Debtors commenced their chapter 11 cases

---

[1] The docket of the Chapter 11 cases, captioned *In re Nuverra Environmental Solutions, Inc.*, No.
17-10949 (KJC) (Bankr. D. Del.), is cited herein as "B.D.I. __." The transcript of the confirmation
hearing, at B.D.I. 362, is cited herein as "7/21/17 Hr'g Tr. at __," and the transcript of the
Bankruptcy Court's oral decision, at B.D.I. 363, is cited herein as "7/24/17 Hr'g Tr. at __." The
*Appendix of Appellant David Hargreaves* (D.I. 33-35) is cited herein as "A__."

("Petition Date"), at which time Debtors had approximately $500 million in secured debt and an uncontroverted value of approximately $302.5 million. (*See* B.D.I. 14 at Art. VIII). On the Petition Date, Debtors filed an initial plan of reorganization, which was amended on June 21, 2017 (B.D.I. 366) ("Plan").

According to Reorganized Debtors, to ensure that the Debtors' businesses remain viable and positioned for growth, the Plan eliminated approximately $500 million of funded debt through the conversion to equity of certain 12.5%/10% senior secured second lien notes due 2021 (the "2021 Notes"), the Debtors' 9.875% unsecured senior notes due 2018 ("2018 Notes"), a term loan facility provided for under the term loan agreement dated April 15, 2016 (the "Term Loan Facility"), and a $12.5 million senior secured, super-priority debtor in possession term credit facility (the "DIP Term Loan Facility"). Significant concessions by senior creditors[2] funded gifted distributions to holders of out-of-the-money general unsecured claims under the Plan.

The Reorganized Debtors argue that the Plan treated unsecured creditors in distinct ways based upon their respective legal rights, their importance to the ongoing operation and the profitability of the Debtors' businesses, and the practical limitations impeding the Debtors' ability to provide such creditors with a recovery. (*See* D.I 37 at 8; 7/21/17 Hr'g Tr. 60:1-62:5). Creditors holding claims derived from the purchase of 2018 Notes, which were classified in Class A6, received a combination of stock and cash by virtue of the gifted distributions from senior creditors,

---

[2] Specifically, holders of 2021 Notes and lenders under the Term Loan Facility and DIP Term Loan Facility voluntarily agreed to accept a lower recovery on their secured claims than they were entitled to receive. The DIP Term Loan Facility and Term Loan Facility converted to equity at a discount, receiving distributions of equity worth less than the face value of the debt converted. (*See* 7/21/17 Hr'g Tr. 7:21-8:13). The 2021 Notes also converted into equity, receiving recoveries of less than 54.5% of their claims, and voluntarily agreeing to forgo any Plan distributions on account of approximately $190 million in unsecured deficiency claims relating to the 2021 Notes, claims that otherwise would have ranked equally with all other unsecured claims. (*See* B.D.I. 338 at ¶ 37).

3

with an aggregate recovery to holders in Class A6 valued at approximately 4-6%. (*See* 7/21/17

Hr'g Tr. at 30:23-25). In contrast, trade and certain other creditors related to the Debtors' business

and operations ("Trade and Business-Related Claims"), classified in Class A7, B7, and C7,[3] were

reinstated under the Plan, and, therefore, holders of such claims were entitled to receive a 100%

recovery by virtue of the gifted distributions. (*See* B.D.I. 14 at 12).

Class A6 voted to reject the Plan.[4] Because the Plan was nonconsensual, Debtors had the

burden of "show[ing] that the plan meets the additional requirements of § 1129(b), including the

requirements that the plan does not unfairly discriminate against dissenting classes and the

treatment of the dissenting classes is fair and equitable." *In re Exide Techs.*, 303 B.R. 48, 58

(Bankr. D. Del. 2003). These requirements were addressed in the Debtors' confirmation brief and

declaration in support. (*See* B.D.I. 302, 338).

Appellant, who held approximately $450,000 of the 2018 Notes that had been classified in

Class A6, objected to confirmation of the Plan (B.D.I. 290) on the grounds that (i) Appellant would

receive a distribution of less value than certain of the Debtors' other unsecured creditors who also

held unsecured claims (i.e., Trade and Business-Related Claims); and (ii) the classification scheme

contemplated in the Plan was improper. Appellant was the sole objector to confirmation of the

Plan. (7/24/17 Hr'g Tr. at 3:24-4:3). At the confirmation hearing on July 21, 2017, Appellant made

---

[3] Included among the Trade and Business-Related Claims were certain contingent litigation claims related to the Debtors' business operations, including tort and personal injury suits that the Debtors believed would be covered under insurance as well as litigation claims to which the Debtors had counterclaims. (*See* 7/21/17 Hr'g Tr. at 59:14-17; 57:23-58:9).

[4] Despite having approximately 80% in number of holders vote to accept the plan, the plan failed to gain the support of 50% in dollar amount. (*See* B.D.I. 154, A746 (voting declaration)). Under § 1126(c) of the Bankruptcy Code, "[a] class of claims has accepted a plan if such plan has been accepted by creditors that hold ... at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan." 11 U.S.C. § 1126(c).

4

arguments and examined and presented witnesses. (*See* 7/21/17 Hr'g Tr.). Appellant offered no evidence to controvert assertions with respect to the existing debt and value of Debtors' businesses. (*See id.*) Following the evidentiary hearing and argument on July 21, 2017, the Bankruptcy Court took the matter under advisement and made a bench ruling via telephonic hearing on July 24, 2017, overruling Appellant's objection and confirming the Plan. (*See* 7/24/17 Hr'g Tr.).

The Bankruptcy Court made the specific finding that "[u]nsecured creditors, including among others, trade creditors and holders of 2018 [N]otes are out of the money because they sit behind over $500 million dollars of secured debt in the company that has an uncontroverted value of approximately $300 million dollars." (7/24/17 Hr'g Tr. at 4:4-10). Addressing Appellant's classification objection, the Bankruptcy Court determined that separate classification of trade creditors and noteholders was reasonable on the basis that trade creditors were critical to the success of the reorganized debtors. (*See id.* at 5:5-6:24). Addressing Appellant's unfair discrimination objection, the Bankruptcy Court determined that, while the disparate treatment of Class A6 gave rise to a rebuttable presumption of unfair discrimination (*id.* at 9:12-14), that presumption was rebutted because Class A6 is "indisputably out of the money and not, otherwise, entitled to any distribution under the bankruptcy code's priority scheme and provided further that the proposed classification and treatment of the unsecured creditors fosters a reorganization of these debtors." (*Id.* at 8:24-9:3). The Bankruptcy Court determined that its decision was consistent with leading cases governing the issue of gifting (9:14-12:12) and rejected Appellant's argument that the gift was from estate property, violated the absolute priority rule, and thus the Plan was not "fair and equitable." (*See id.*) The Bankruptcy Court overruled the objection, confirmed the Plan (*id.* at 13:24-14:5), and further held that any request for a stay of the Confirmation Order beyond the 10-

day period included therein "would serve no purpose" as a stay was not warranted. (*See id.* at 14:19-15:3).

Appellant filed a timely notice of appeal on July 25, 2017. (D.I. 1). Contemporaneously, Appellant filed an emergency motion for stay of the Confirmation Order pending appeal (D.I. 3) ("Stay Motion") and a related motion for expedited consideration (D.I. 4). On August 3, 2017, the Court denied the Stay Motion on the basis that Appellant was unlikely to succeed on the merits of the appeal and had failed to establish irreparable harm absent a stay. (D.I. 20). On October 16, 2017, Debtors filed the Motion to Dismiss. (D.I. 31). The parties have fully briefed the Motion to Dismiss (D.I. 31, 32, 36, 40) and the merits of the appeal (D.I. 29, 37, 41). On May 14, 2018, the Court held oral argument on both the Motion to Dismiss and the merits of the appeal. (D.I. 44).

## II.     CONTENTIONS

Appellant raises the following issues on appeal: (i) whether the Bankruptcy Court erred by concluding that the Plan did not discriminate unfairly in finding that the "gift" under the Plan made by secured creditors to unsecured creditors providing varying levels of claim recovery did not constitute unfair discrimination under § 1129(b)(1) of the Bankruptcy Code; and (ii) whether the Bankruptcy Court erred by concluding that the Plan properly classified 2018 Note claims separately from other general unsecured claims. (*See* D.I. 22 at ¶ 1-3).[5]

With respect to equitable mootness, Reorganized Debtors argue that the Plan has been substantially consummated. Reorganized Debtors assert that, if I agree with Appellant that the Plan unfairly discriminated against and/or improperly classified Class A6 claims, correcting those errors

---

[5] Appellant identified the following additional issue on appeal but failed to address it in merits briefing: "whether the Bankruptcy Court erred by concluding that the Plan was fair and equitable even though it allows the Debtors to retain equity interests in their subsidiaries despite all unsecured creditors not being paid in full." (*Compare* D.I. 22 & 29). Accordingly, I do not consider this issue.

would require a wholesale reversal of the Plan, restoration of the Reorganized Debtors' estates to the *status quo ante* prior to the Effective Date, and disgorgement of the gifted distributions, which is not possible as a practical matter and which would necessarily harm third parties who reasonably relied on plan confirmation. (*See* D.I. 31 at 3).

According to Appellant, this argument fails, as "[t]he Debtors can easily pay [him] the full amount of his claim if his appeal is successful" as such "additional recovery by [Appellant] does not present a risk of fatally scrambling the Plan; nor does it present a risk of significant harm to third parties." (*See* D.I. 36 at 1, 12). Appellant urges the Court to use its remedial powers to fashion the relief he proposes: an order directing Reorganized Debtors to pay 100% of Appellant's claim, plus several months' interest, so he may "receive the same treatment of holders of general unsecured creditors in Class A7." (*See id.* at 12-13).

With respect to the merits, Appellant argues that the Bankruptcy Court erred in concluding that the Plan did not improperly classify Class A6 Claims separately from other general unsecured claims. Appellant argues the separate classification was motivated "solely for the discriminatory purpose of not having to pay holders of the 2018 Notes Claims in full." (*See* D.I. 29 at 14; 31-35). Appellant argues that even if the Plan's separate classification of general unsecured claims was proper, the Plan unfairly discriminates in its treatment of 2018 Note claims, and that the Bankruptcy Court erred in its application of the Markell test (discussed below). (*See id.* at 15-18). Appellant argues that the Bankruptcy Court failed to properly consider whether Debtors had rebutted the presumption of unfair discrimination and relied instead merely on gifting. (*See id*. at 16-18). Appellant argues that such a gift cannot rebut the presumption of unfair discrimination under the Markell test, and that the entire concept of gifting has been flatly rejected by the Third Circuit. (*See id*. at 28-29).

Conversely, Reorganized Debtors argue that Appellant relies on cases that prohibit the use of gifts in contravention of the absolute priority rule, which is not at issue in this appeal. (*See* D.I. 37 at 14). "That body of law prohibits the gifting of a distribution from a senior class of creditors in a manner that skips over an intermediary junior class of dissenting creditors – "vertical gifting" – because it violates the strict requirements of the absolute priority rule." (*Id.*) The distribution in this case concerns unequal gifts by a secured creditor to two classes of junior creditors – horizontal gifting – which is not foreclosed under Third Circuit law. (*See id.* at 25). According to Reorganized Debtors, courts in this circuit have held that such a horizontal gift is not unfair discrimination against the class that does not receive the larger gift when (i) the creditor that does not receive the larger gift is not entitled to a distribution under a plan, and (ii) no class junior to the creditor receives a distribution under the plan. (*See id.* at 12-13). Debtors argue that confirmation of the Plan is consistent with controlling caselaw on the issue as well as the legislative history of § 1129(b), which makes clear that unfair discrimination is not an absolute rule, but is instead evaluated case by case from the dissenting "class's own perspective." (*See id.* at 12 (citing H.R. Rep. No. 595, 1st Sess. 417 (1977)). Finally, the Reorganized Debtors contend that the Bankruptcy Court correctly concluded that the Plan's classification complied with legal standards in this circuit, which permit separate classification of trade and bondholder claims based on their legal attributes. Reorganized Debtors argue the uncontroverted record supports the Bankruptcy Court's finding that separate classification of Trade and Business-Related Claims serves the rational purpose of fostering the Debtors' reorganization. (*See id.* at 35-43).

## III.    JURISDICTION

The Court has jurisdiction to hear an appeal from a final judgment of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1). In reviewing the bankruptcy court's determinations, this Court

8

"review[s] the bankruptcy court's legal determinations *de novo,* its factual findings for clear error and its exercise of discretion for abuse thereof." *See In re Trans World Airlines, Inc.,* 145 F.3d 124, 130 (3d Cir. 1998) (noting that both the Third Circuit and the district court "exercise the same standard of review") (internal quotations and citations omitted).

## IV.    DISCUSSION

### A.    The Appeal Meets the Criteria for Equitable Mootness

"'Equitable mootness' is a narrow doctrine by which an appellate court deems it prudent for practical reasons to forbear deciding an appeal when to grant the relief requested will undermine the finality and reliability of consummated plans of reorganization." *Tribune,* 799 F.3d at 277.   A court assesses equitable mootness through the application of "prudential" considerations that address "concerns unique to bankruptcy proceedings." *In re Philadelphia Newspapers, LLC,* 690 F.3d 161, 168 (3d Cir. 2012).   The Third Circuit's recent decisions have synthesized the test for equitable mootness as "proceed[ing] in two analytical steps: (1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation." *In re Tribune Media Co.,* 799 F.3d 272, 278 (3d Cir. 2015) (quoting *In re SemCrude,* 728 F.3d 314, 321 (3d Cir. 2013)).   Reorganized Debtors, as the proponents of an equitable mootness dismissal, "bear[] the burden of overcoming the strong presumption that appeals from confirmation orders of reorganization plans – even those not only approved by confirmation but implemented thereafter (called 'substantial consummation' or simply 'consummation') – need to be decided." *Id.* at 278.

### 1.    Whether the Plan Has Been Substantially Consummated

The Bankruptcy Code defines "substantial consummation" to mean:

9

(A)     transfer of all or substantially all of the property proposed by the plan to be
        transferred;

(B)     assumption by the debtor or by the successor to the debtor under the plan of
        the business or of the management of all or substantially all of the property
        dealt with by the plan; and

(C)     commencement of distribution under the plan.

11 U.S.C. § 1101(2). Appellant concedes that the Plan has been substantially consummated. (*See*

D.I. 36 at 12 (conceding that "the Plan has been substantially consummated"); *see also* D.I. 44 at

17:20-18:2). The record supports this conclusion.[6]

   If it is established that substantial consummation has occurred, the next step for a court

considering equitable mootness is to "look to whether granting relief will require undoing the plan

as opposed to modifying it in a manner that does not cause its collapse." *SemCrude*, 728 F.3d at

321. A court "should also consider the extent that a successful appeal, by altering the plan or

otherwise, will harm third parties who have acted reasonably in reliance on the finality of plan

confirmation." *Id.*

### 2.  Granting Appellant Higher Individual Recovery than Class A6

   Appellant apparently does not seek revocation of the Plan and the imposition of a new

chapter 11 plan in its place. (D.I. 44 at 17:19-18:2). Although Appellant's confirmation objection

---

[6] The Reorganized Debtors filed a declaration of their Chief Restructuring Officer ("CRO") Robert
Albergotti (D.I. 32) ("Albergotti Decl."), in which he attests, *inter alia*, that, beginning on the
Effective Date, Reorganized Debtors entered into certain financing exit facilities and security
agreements in order to repay obligations under the Debtors' pre-Effective Date asset based lending
facility and debtor-in possession lending facility; make certain required payments under the Plan;
pay costs and expenses incurred in connection with the Plan; and for working capital, transaction
expenses, and other general corporate expenses. (*See* Albergotti Decl. at ¶¶ 6-9). Additionally, on
the Effective Date, (i) Reorganized Debtors issued approximately 12 million shares of reorganized
Nuverra common stock (that is freely tradable on a national stock market) and 118,137 warrants to
purchase shares, with an exercise term expiring 5 years from the Effective Date, or, in certain
instances, as specified in the Plan; and (ii) all shares of the Debtors pre-Effective Date common
stock and outstanding equity interests in the Debtors were cancelled and discharged. (*See id.* at ¶
10). Additionally, cash distributions were made under the Plan and all prepetition debt was either
repaid or cancelled. (*See id.* at ¶ 11).

sought denial of Plan confirmation only, Appellant argues "that does not mean that the only relief available after the substantial consummation of the Plan is a complete unwinding of the Plan and a return to bankruptcy for the Debtors."[7]  (D.I. 36 at 13).  Rather than apply equitable mootness and dismiss his appeal, however, Appellant contends that the Court should exercise its remedial powers and fashion relief in a way that would not upset the Plan – *i.e.*, "by ordering payment of his claim in full" so Appellant may "receive the same treatment as the holders of general unsecured creditors in Class A7." (*See id.* at 12-13).

The Third Circuit instructs that the "starting point is the relief an appellant specifically asks for." *Tribune*, 799 F.3d at 278 (citations omitted).  The only specific relief Appellant proposes is "full recovery" which is a much higher individual recovery than other holders of claims in Class A6.  (*See* D.I. 44 at 23:22-24:9)  Thus, in considering available relief to cure unfair discrimination, the Court's "starting point" is an order directing Reorganized Debtors to "provide [Appellant] with the same treatment as general unsecured creditors – payment of 100 cents on the dollar plus interest" – as compared with the 4-6% recovery provided to other members of Class A6.  (*Id.*) According to Appellant, "because no bondholder other than Mr. Hargreaves filed a timely objection to the Plan, there is no danger that paying Mr. Hargreaves would require additional payments to any other bondholder." (*See id.*)  That such relief would result in disparate treatment of Appellant's

---

[7] Reorganized Debtors argue that Appellant never sought full payment of his claim below, and only sought denial of plan confirmation, and cannot be heard to make such a request now:

> Appellant takes a 180-degree turn from the substantive position that he raises in the Appeal by suggesting that a claim of unfair discrimination could be satisfied by discriminating in favor of him relative to other holders of claims in his class.  Appellant now identifies the sole remedy he seeks on appeal as the payment in full of his claims, and only his claims... By recasting the issue in that manner, Appellant has abandoned his contention that the Plan's distribution scheme could be changed to address his unfair discrimination and classification arguments, effectively conceding that doing so would fatally scramble the Plan.

(*See* D.I. 40 at 1-2).

claim as compared with all other bondholder claims in Class A6 – precisely the issue that predicates the appeal – is of little concern to Appellant and of much concern to the Court. Appellant offers no support for his position that a remedy exists that allows him to receive, on appeal, treatment better than other creditors in the same class. (*See* D.I. 44 at 20:23-21:1).

However, it is not Appellant's burden to show that his success on appeal will not require undoing the plan; rather, it is the burden of the Reorganized Debtors, as the moving party, to demonstrate that the prudential factors weigh in favor of dismissal. *In re One2One Commc'ns, LLC*, 805 F.3d 428, 436 (3d Cir. 2015). Reorganized Debtors argue that the higher individual relief proposed by Appellant would necessarily upset the Plan. As Reorganized Debtors argue, there is no mechanism under the Bankruptcy Code by which Appellant's claim can be paid in full outside of the confirmed Plan without paying in full the other members of Class A6. (*See* D.I. 31 at 16-17). Having placed the 2018 Noteholders in the same class, Reorganized Debtors argue, it would violate § 1123(a)(4) of the Bankruptcy Court to provide Appellant alone with a full recovery. Section 1123(a)(4) requires that "a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment . . . ." 11 U.S.C. § 1123(a)(4). This section prohibits preferential treatment of a single bondholder who holds the exact same claims based upon the exact same instrument as other bondholders. Appellant's argument that § 1123(a)(4) of the Bankruptcy Code does not prohibit disparate treatment, so long as creditors "ha[d] an equal opportunity to recover on their claims" is unpersuasive and not supported by the cases cited. (*See* D.I. 36 at 15, n.5).

The Court agrees with the conclusion reached in *In re Genesis Health Ventures, Inc.*, 280 B.R. 339 (D. Del. 2002) ("*Genesis II*"). There, appellant was a bondholder who appealed plan confirmation on the basis that his small percentage recovery, in the form of new common shares and

warrants, was the result of the debtors' incorrect application of valuation methodologies which understated the enterprise value of the reorganized entity and the securities issued to senior secured lenders under the plan. *See id.* at 342. Debtors moved to dismiss the appeal as equitably moot, and the Court granted the dismissal, finding, *inter alia*:

> [T]he Plan in this case was consented to by all of the creditors except for Class G5 bondholders like Appellant. Class G5 creditors have allowed claims in the amount of $387 million. Appellant is a creditor holding $20 million of Genesis bonds. Under the Bankruptcy Code, creditors of the same class are to be treated in the same manner unless they consent to receive less favorable treatment. 11 U.S.C. § 1123(a)(3)-(4); 11 U.S.C. § 1129(b)(1) (prohibiting unfair discrimination among creditors when plan is confirmed over objection of non-consenting creditors). The relief Appellant proposes, i.e., the issuance of additional shares to him, would be unfair to the other creditors in Appellant's own class, and thus, prohibited under the Bankruptcy Code.

*Id.* at 346. Moreover, even assuming the Court could grant the higher individual recovery to Appellant without violating the Bankruptcy Code, it is unclear which party the Court may order to fund such a recovery. Appellant clearly seeks payment from the Reorganized Debtors' business. (*See* D.I. 44 at 23:18-21). However, the gifted distributions were funded by the collective, agreed concessions of various senior lenders, and the Court cannot order those creditors to supplement a gift made voluntarily. The only way to accomplish this would include a regifting by the former holders of 2021 Notes, which would require their vote in chapter 11.

Appellant argues that a higher individual recovery may be granted, but the cases cited by Appellant do not support such relief. Appellant argues, "The Third Circuit has repeatedly found that payments of small percentage amounts of a reorganized debtors' enterprise value would not fatally scramble a plan." (*See* D.I. 36 at 13-14). Appellant argues that in *Philadelphia Newspapers*, the court found that appellants' claim would not unravel plan as it accounted for only 1.7% of amount buyer paid to acquire debtors' assets. *See In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 170-71 (3d Cir. 2012). In that case, appellant sought payment of administrative expense

claims, which, if ultimately allowed in a successful appeal, would be paid from an account

established under the plan for the payment of such claims and the payment would represent only a

small percentage of the money coming into the estate by virtue of the asset sale consummated under

the plan. *See id.* at 167. As that appeal concerned the allowance of administrative expenses,

however, success on appeal would not entitle appellant to a greater recovery than other holders of

administrative expense claims.

Appellant also cites *Zenith*, where the court similarly noted that appellant sought "the

disgorgement of $76,500 in professional fees, a tiny sum in the context of the reorganization of a

company valued at $300 million." *See United States Tr. v. Official Comm. of Equity Sec. Holders

(In re Zenith Elecs. Corp.)*, 329 F.3d 338, 346 (3d Cir. 2003). In *Zenith*, the United States Trustee

appealed the award, and sought the disgorgement of $76,500 in professional fees awarded to

counsel to an unofficial committee. The District Court dismissed the Trustee's appeal as equitably

moot, and the Third Circuit reversed, observing that "far from causing the reorganization plan to

unravel, the Trustee's appeal, if successful, would return money to the estate." *Id.* at 346. As

Reorganized Debtors correctly observe, the appeals in both *Philadelphia Newspapers* and *Zenith*

each concerned whether appellant's claim should have been allowed. Here, there is no dispute over

the allowance of Appellant's claim – all of the claims of holders of 2018 Notes, including

Appellant's, were allowed, but received limited recoveries under the Plan. These cases do not

support a higher individual recovery by Appellant than other members of Class A6.

At oral argument, *Tribune* was cited as Appellant's "best case" in support of his request for

full recovery. (*See* D.I. 44 at 20:4-18). The *Tribune* court declined to dismiss one of two appeals as

equitably moot and suggested that disgorgement to satisfy appellant-trustee's claim was an

available remedy. *See Tribune*, 799 F.3d at 283. The court observed that there was no chance the

14

plan modification would unravel the plan, as the dispute concerned class entitlement to a $30 million recovery in the context of a $7.5 billion reorganization. *See id.* However, the appeal in that case concerned an intercreditor dispute over whether one of two classes of creditors was entitled to funds under the relevant contract.[8] *Tribune* was not a case where one member of a class sought relief on appeal in the form of a higher individual recovery than the recovery provided to other members of the same class, as here. If successful on appeal, the relief sought in *Tribune* would have gone to the entire class: "disgorgement could be ordered against those Class 1F holders who have received more than their fair share, and the Litigation Trust's waterfall can be restructured to make sure that [Class] 1E gets its recovery to the exclusion of Class 1F." *Id.* at 282-83.

These decisions do not support the higher individual relief Appellant requests. While the cases support the notion that granting relief on a successful appeal is unlikely to unravel the plan where the relief would represent only a small percentage of the overall reorganization, those cases say nothing about a case like this one, where granting appellant relief that is a small percentage of the overall reorganization would violate § 1123(a)(4) of the Bankruptcy Code.

Finally, Appellant cites *SemCrude* in support of his argument that he is entitled to higher individual recovery than the rest of Class A6 because he alone objected to the plan and appealed. (*See* D.I. 36 at 16; D.I. 44 at 16:22-17:8). In *SemCrude*, appellants argued that the plan improperly discharged their claims arising from statutory liens and property rights and sought an opportunity to assert those claims in an adversary proceeding. *See SemCrude*, 728 F.3d at 320. The court found no reason to believe that granting relief would cause the plan to collapse. *See id.* at 324. "Even if

---

[8] "[T]he Trustees contend that they are beneficiaries of a subordination agreement that guarantees that they will receive any recovery that goes to the holders of the PHONES and EGI Notes ahead of a class of trade and other creditors (Class 1F) … The merits question presented by the Trustees' appeal is straightforward: does the Plan unfairly allocate Class 1E's recovery to 1F?" *Tribune*, 799 F.3d at 282-83.

Appellants are successful on their claims, … the amounts involved will not require a sufficient redistribution of assets to destabilize the financial basis of the settlement." *Id.* Although *SemCrude* did draw a distinction between granting individual relief to appellant (versus parties who failed to appeal), that distinction is inapposite under these facts. As Reorganized Debtors correctly argue, any creditor may elect to consent to a release of its claims, which is effectively what the Third Circuit concluded the nonappealing creditors did in *SemCrude*.[9] There is no analogue in the Bankruptcy Code for an individual creditor to withhold consent to a distribution in order to get a higher distribution under a plan than other creditors in the same class.

### 3. Other Practicable Relief

The Third Circuit instructs that "even when a court applies the doctrine of equitable mootness, it does so with a scalpel rather than an axe. To that end, a court may fashion whatever relief is practicable instead of declining review simply because full relief is not available." *Tribune,* 799 F.3d at 278 (internal citations and quotations omitted). Assuming Appellant is successful on appeal, however, it is unclear what other practicable relief I may grant at this point. To meet their burden, the Reorganized Debtors assert that there is no practicable relief that can be granted with respect to the unfair discrimination and improper classification arguments at issue in this appeal that would not collapse the Plan and harm third parties who justifiably relied on plan confirmation. (*See* D.I. 31 at 12-18; D.I. 32).

---

[9] As the *SemCrude* court observed: "We also fail to see any indication that allowing Appellants to proceed with their claims would result in a deluge of other Producers filing their own adversary proceedings. Unlike with Appellants, we are unaware of any evidence in the record showing that other Producers objected to the discharge of their claims or asserted the right to an adversary proceeding. In return for the distributions they received under the plan, other Producers were required to dismiss with prejudice any adversary proceedings they had filed. Absent their objecting at the time of plan confirmation to this dismissal requirement (as well as to the discharge of their claims), they cannot now attempt to restart those actions." *SemCrude,* 728 F.3d at 324.

Debtors argue that to address the unfair discrimination issue, the only possible remedy would be to provide equal recoveries to all unsecured creditors. (*See* D.I. 31 at 13). Reorganized Debtors argue that they do not have $40 million in cash that would be required to pay claims of former holders of the 2018 Notes in full. (*See id.*) Even if sufficient cash were available, there would be no practical way to distribute it, according to Reorganized Debtors, as the 2018 Notes were cancelled under the Plan, and the indenture trustee for the 2018 Notes discharged of its duties and obligations under the governing indenture. (*See id.* at 14). As Reorganized Debtors lack sufficient cash to pay bondholders in full, the only other relief would be to recover funds and balance recoveries among general unsecured creditors. In *Tribune,* the Third Circuit noted that "if funds can be recovered from third parties without a plan coming apart, it weighs heavily against barring an appeal as equitably moot, both in our Court and other circuits." *Tribune*, 799 F.3d at 279. Reorganized Debtors argue that this is not such a case. According to Reorganized Debtors, ordering disgorgement and recovery of the gifted distributions, and redistributing those distributions evenly among Classes A6 and A7, "would involve a massive, and likely impossible, disgorgement exercise:"

> Although it is possible to conceive of a disgorgement scenario to recover all Gifted Distributions that had been provided to all unsecured creditors in order to redistribute them among former holders of Class A6 Claims and General Unsecured Claims, such a recovery effort would be virtually (if not actually) impossible to accomplish. The exercise would involve seeking the disgorgement of Reorganized Nuverra Common Stock, which is freely trading on NYSE American. Courts in this Circuit have recognized that there is no practical way to retrieve distributions from public security holders … It is for that reason that the Third Circuit has "most frequently found that a plan could not be retracted when the reorganized debtor issued [publicly] traded debt or securities."

(D.I. 31 at 14 (quoting *One2One,* 805 F.3d at 436)). Additionally, Reorganized Debtors assert that a disgorgement of payments from customers and vendors who have continued doing business with

the Reorganized Debtors "would irreparably damage [those] relationships … and disrupt ongoing

operations, jeopardizing stakeholder recoveries:"

> The Reorganized Debtors operate in a variety of remote areas where the vendor base is
> limited, and many are small businesses. [F]ailing to pay vendors in some of these locations
> would have led those vendors to refuse to do business with the Reorganized Debtors,
> creating significant operational problems in areas where those vendors are not replaceable.
> [A] disgorgement exercise that involves the clawback of payments to vendors and suppliers
> would in turn lead to the loss of credit, vendors, and suppliers, which would cause
> significant harm to all stakeholders, especially senior creditors who own the Reorganized
> Debtors' equity and depend on the success of the Reorganized Debtors' businesses to
> achieve a recovery in these cases.

(*See* D.I. 32 at 8, ¶ 14 (affidavit of CRO)).  Thus, disgorgement would require the claw back, not

only of cash payments made to hundreds of individual creditors, but also the claw back of stock that

is trading on the national stock exchange, and which now may be held by third parties who

purchased those securities in the ordinary course.  (*See id*).  This case is therefore unlike the *Tribune*

case in which the Third Circuit suggested disgorgement as a possible remedy.  *Tribune*, 799 F.3d at

282.  There, the court notably observed that the money at issue "has gone to a readily identifiable

set of creditors against whom disgorgement can be ordered."  *Id.*  Unlike *Tribune*, the disgorgement

required in this case to grant equal recovery to Class A6 will require undoing the Plan and

necessarily result in harm to third parties.

 With respect to the second issue on appeal, as the Bankruptcy Court observed, Appellant

"objects to the debtors' classification scheme for the same reason [as his unfair discrimination

objection] arguing that classification of unsecured claims in more than one class is improper and

calls for disparate treatment."  (7/24/17 Hr'g Tr. at 5:1-4).  To address the improper classification

issue, Reorganized Debtors argue that the only possible remedy would require "having the

Reorganized Debtors go back into chapter 11 in order to develop an amended plan that classifies all

unsecured claims in the same class and provides all creditors in the single class with the same

treatment." (*See* D.I. 31 at 16-17). Reorganized Debtors argue that, having repaid the DIP Loans

on the Effective Date, they no longer have access to liquidity to fund a second trip through chapter

11, which makes a forced liquidation through chapter 7 a likely outcome. (*See id.* at 4). "If the

Reorganized Debtors were forced to re-enter bankruptcy to revise their plan, I believe liquidation is

a likely possibility, given that the Reorganized Debtors lack financing for a second Chapter 11 case,

and had an extremely difficult time obtaining financing for the case they just emerged from." (D.I.

32 at 8, ¶ 15 (affidavit of CRO)). As with the remedy of providing equal recovery to general

unsecured creditors, reclassifying the claims to balance distributions and to achieve the same result

would "require undoing the plan as opposed to modifying it in a manner that does not cause its

collapse," and would result in harm to third parties who have justifiably relied on the Plan.

*SemCrude*, 728 F.3d at 321.

The Bankruptcy Court recognized the overall harm to the Debtors and other third parties that

may result on appeal: "the consequences of an adverse ruling on appeal of a reversal of this

confirmation order on appeal, frankly, the risks lie with the other constituents in this case, not with

[Appellant] …" (7/24/17 Hr'g Tr. at 14:24-15:3). The Court is unable grant Appellant higher

individual recovery than other members of his class within the confines of the Bankruptcy Code.

Because correcting unfair discrimination and improper classification issues would require undoing

the Plan and would necessarily harm third parties, and because it is unclear what other practicable

relief the Court may grant, the appeal meets the criteria for equitable mootness.

**B.  The Confirmation Order Is Affirmed**

Although I find the appeal meets the criteria for equitable mootness, the Court can "readily

resolve the merits of [the] appeal against the appealing party," so I hold, in the alternative, that the

Confirmation Order is affirmed. *See Tribune*, 799 F.3d at 278.

Under § 1129(b)(1) of the Bankruptcy Code, a plan may be "crammed down" on a

dissenting impaired class only if it "does not discriminate unfairly" and is "fair and equitable" with

respect to the non-accepting impaired class. *See* 11 U.S.C. § 1129(b)(1); *see also In re Armstrong*

*World Indus., Inc.*, 320 B.R. 523 (D. Del. 2005) ("*Armstrong I*"), *aff'd*, 432 F.3d 507 (3d Cir. 2005)

("*Armstrong II*"). "[T]he pertinent inquiry is not whether the plan discriminates but whether the

proposed discrimination is 'unfair.'" *In re Tribune Co.,* 472 B.R. 223, 242 (Bankr. D. Del. 2012)

(quoting *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) ("*Armstrong III*")).

The main issue on appeal is whether the Plan "discriminates unfairly" in a manner that would

prevent the Plan from being confirmed in accordance with § 1129(b)(1).

The concept of unfair discrimination is not defined in the Bankruptcy Code. *See Armstrong*

*III*, 348 B.R. at 121. Courts typically examine the facts and circumstances of the particular case to

determine whether unfair discrimination exists.[10] Various tests have emerged in the caselaw, with

the hallmarks being "whether there is a reasonable basis for the discrimination, and whether the

debtor can confirm and consummate a plan without the proposed discrimination." *Id.* at 121

(internal quotation omitted). The Third Circuit has not yet discussed the standard that should apply

when assessing unfair discrimination, but courts within this jurisdiction have applied the test set

forth by Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am.

Bankr. L.J. 227, 249 (1998). Under the Markell test, a rebuttable presumption of unfair

discrimination arises when there is:

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's
> treatment of the two classes that results in either (a) a materially lower percentage recovery

---

[10] *See In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan," and that "the limits of fairness in this context have not been established"), *aff'd*, 195 B.R. 692 (N.D. Ill. 1996), *aff'd*, 126 F.3d 955 (7th Cir. 1997), *rev'd on other grounds*, 526 U.S. 434 (1999).

for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*See, e.g.*, *Tribune*, 472 B.R. at 241 (adopting and applying Markell test); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001) ("*Genesis I*") (applying Markell test). As Reorganized Debtors correctly point out, in applying the Markell test, "the analysis for determining whether the discriminatory treatment is unfair should be viewed by its effect on the dissenting class." *Tribune*, 472 B.R. at 244. This is consistent with the legislative history of § 1129(b)(1), which makes clear that "[t]he criterion of unfair discrimination is not derived from the fair and equitable rule or from the best interest of creditors test. Rather it preserves just treatment of a dissenting class from the class's own perspective." H.R. Rep. No. 595, 1st Sess. 417 (1977).

### 1. The Bankruptcy Court Correctly Determined that the Plan Did Not Unfairly Discriminate

Appellant argues that the Bankruptcy Court improperly applied the Markell test and blindly relied on the gifting doctrine in determining that the presumption of unfair discrimination was rebutted in this case. (*See* D.I. 29 at 15-18). I note that the Markell test did not address a situation in which the classes in which disparate treatment was occurring both were receiving their recoveries solely on account of a gift from a senior class.[11] Indeed, Markell says nothing about gifting. Notwithstanding this distinction, the Court finds no error in the Bankruptcy Court's application of the Markell test. Its application is consistent with the decisions of other courts in this circuit which have examined gifted distributions.

---

[11] Reorganized Debtors argue that the Markell test was intended to fill in the blanks on how a court should assess disparate treatment of claims outside of a scenario where distributions are based solely on gifts. (*See* D.I. 44 at 38:20-25). The Court expresses no opinion on this argument.

Looking to percentage recovery between Classes A6 and A7, the Bankruptcy Court determined that the Plan's treatment "gives rise to a rebuttable presumption of unfair discrimination that the [D]ebtors must overcome." (7/24/17 Hr'g Tr. at 9:12-14). The Bankruptcy Court found the presumption rebutted. Specifically, the Bankruptcy Court found that the gift here "constitute[d] no unfair discrimination" (*id.* at 8:23-24) because "class A6 was indisputably out of the money and not, otherwise, entitled to any distribution under the Bankruptcy Code's priority scheme and provided further that the proposed classification and treatment of other unsecured creditors fosters a reorganization of these debtors." (*Id.* at 8:24-9:9). As noted above, in applying the Markell test, and identifying unfair discrimination, the analysis for determining whether the discriminatory treatment is unfair should be viewed by its effect on the dissenting class. *See* H.R. Rep. No. 595, 1st Sess. 417 (1977). For example, in *Tribune*, the bankruptcy court applied the Markell test to a plan that involved classes that benefitted from differing treatment, receiving an increase in their recovery of between 47.8% and 53% on a dollar basis, which was caused by the forced sharing of a "Disputed Allocation." *See Tribune*, 472 B.R. at 244. The Bankruptcy Court held that, in applying the Markell test, "the analysis for determining whether the discriminatory treatment is unfair should be viewed by its effect on the dissenting class." *Id.* In reaching its conclusion that there was no unfair discrimination, the *Tribune* court only focused on the amount that the reallocation decreased the recovery to the dissenting class, and did not consider the large increase in recoveries to the other similarly-situated classes. *See id.* at 244.[12]

---

[12] *See also LaSalle*, 126 F.3d at 969 (factually predating Markell, and finding, in part, that, "the disparity between [the trade claims and the nonrecourse deficiency claims], with the trade creditors receiving 100 percent and Bank America receiving sixteen percent, is not unfair [because] Bank America does better than it would have under chapter 7, and the trade creditors do no worse.")

Similarly, here, distributions to holders of Trade and Business-Related Claims have no

impact on the distributions to holders of unsecured claims in Class A6. The record is clear that

unsecured creditors are entitled to nothing under the Bankruptcy Code's priority scheme, and an

increased distribution to unsecured creditors holding Trade and Business-Related Claims does not

diminish the distribution to holders of claims in Class A6. If holders of Trade and Business-Related

Claims did not receive this increased recovery, the surplus distribution would revert to secured

creditors, not holders of claims in Class A6. As Appellant and his class were not entitled to a

distribution in the first place, providing a greater distribution to a different class of unsecured

creditors does not alter the distribution to which Appellant is entitled.

Appellant argues that the Bankruptcy Court erred by failing to address whether the two

bases for rebuttal specifically mentioned by Markell were satisfied. Rebuttal of the presumption is

discussed briefly by Markell:

> The unfair discrimination in these situations is only presumptive. The plan proponent may
> overcome the presumption based on different percentage recoveries by showing that a lower
> recovery for the dissenting class is consistent with the results that would obtain outside of
> bankruptcy, or that a greater recovery for the other class is offset by contributions from that class
> to the reorganization. The presumption of unfairness based on differing risks may be overcome
> by a showing that the risks are allocated in a manner consistent with the prebankruptcy
> expectations of the parties.

Markell, 72 Am. Bankr. L.J. at 228.

> In either case—disparity of recovery or disparity of risk—the plan proponent can rebut the
> presumption of unfairness by proving that the difference in treatment is attributable to differences
> in the prepetition status of the creditors. In the case of a difference in the present value of the
> recovery, the presumption may also be overcome by a demonstration that contributions will be
> made by the assenting classes to the reorganization, and that these contributions are commensurate
> with the different treatment. In such cases, while discrimination exists, it is not unfair.

*Id.* at 250. Appellant argues that if the Bankruptcy Court had considered Markell's bases for

rebuttal, neither prong would have been met here, as (i) all unsecured creditors would be entitled to

exactly the same percentage recovery outside of the Plan, and (ii) there is no proof that the holders

of [Trade and Business-Related Claims] will infuse any new value into the reorganization." (*See* D.I. 29 at 17).

While Appellant argues these are the "only" bases for rebutting the presumption of unfair discrimination (*see id.* at 16), neither Markell nor any of the cases cited by Appellant suggest any limitations on the case-specific facts and circumstances which might rebut the presumption of unfair discrimination. As Reorganized Debtors correctly argue, "the Markell test is not the only basis for rebutting a presumption of unfair discrimination, and the Bankruptcy Court was not required to evaluate these bases for rebuttal …." (*See* D.I. 37 at 23). As noted above, Markell did not address a situation where, as here, the classes in which disparate treatment was occurring both were receiving their recoveries solely on account of a gift from a senior class. A reading of Markell does not support the limitations on the Bankruptcy Court's analysis that Appellant asserts, nor would such limitations be consistent with the Bankruptcy Court's broad discretion to consider case-specific facts in the context of plan confirmation.[13]

In *Genesis I*, a case with virtually identical facts, the court found the presumption of unfair discrimination was rebutted in the horizontal gifting context. *See Genesis I*, 266 B.R. at 612. As in this case, the plan in *Genesis I* provided a gift to certain, but not all, classes of unsecured creditors out of the recoveries of secured creditors. *See id.* at 600-01. In that case, the unsecured creditors holding punitive damage litigation claims classified in classes G7 and M7 were to receive no recovery, while the other classes of general unsecured creditors (classes G4 and M4) received the gift. *Id.* Holders of claims in classes G7 and M7 objected, arguing, among other things, that the plan unfairly discriminated against them in light of the recovery to unsecured creditors in classes G4

---

[13] "[I]t remains clear that Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case." *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987).

and M4. In assessing unfair discrimination, the court in *Genesis I* applied the Markell test and

concluded that, while the disparate treatment gave rise to the presumption of unfair discrimination,

the presumption was rebutted:

> [T]he recovery by Classes G4 and M4 of a dividend in the form of New Common
> Stock and Warrants is based on the agreement of the Senior Lenders to allocate a
> portion of the value they would have otherwise received to Classes G4 and G5. The
> disparate treatment … is a permissible allocation by the secured creditors of a portion
> of the distribution to which they would otherwise be entitled, rather than unfair
> discrimination against Classes G7 and M7 by the proponents of the plan.

*Id.* at 612. Thus, *Genesis I* found that the presumption of unfair discrimination was rebutted where

the distribution was based on the agreement of senior lenders to allocate a portion of the value to

which they would have otherwise been entitled under the Bankruptcy Code. *See id.* Although

gifting is not a basis for rebuttal specifically mentioned by Markell, the *Genesis I* court found this

permissible allocation sufficient to rebut the presumption of unfair discrimination. The Bankruptcy

Court's ruling here is consistent with *Genesis I.*[14]

---

[14] Reorganized Debtors further argue that, despite not being required to evaluate Markell's specific
bases for rebuttal, the Bankruptcy Court's ruling does address them, including "factual findings that
support rebuttal of any presumption of unfair discrimination under the Markell framework." (*See*
D.I. 37 at 23). Reorganized Debtors argue that Markell's first basis for rebuttal – that a lower
recovery for the dissenting class is consistent with the results that would obtain outside of
bankruptcy – is present here, as there was no value in the Debtors' businesses to make any payment
to unsecured creditors. The Bankruptcy Court found as much when it concluded that unsecured
creditors "sit behind over $500 million dollars of secured debt in the company that has an
uncontroverted value of approximately $300 million dollars." (7/24/17 Hr'g Tr. at 4:4-8).
Appellant does not challenge the Bankruptcy Court's factual determination regarding the
Appellant's entitlements to proceeds of the Debtors' estates, nor does he offer any explanation of
how, from the perspective of the 2018 Notes, recoveries could be any better outside of bankruptcy.
Reorganized Debtors argue that Markell's second basis for rebuttal – that a greater recovery for the
other class is offset by contributions from that class to the reorganization – is also present here. The
Bankruptcy Court made findings indicating that the ongoing business relationships provided by
business creditors created value which justified the Plan's classification and treatment of unsecured
creditors. (*Id.* at 6:6-24).

As unfair discrimination is not defined in the Bankruptcy Code, courts must examine the facts and circumstances of the particular case to determine whether unfair discrimination exists. The Third Circuit has yet to mandate application of the Markell test in determining whether a plan discriminates unfairly, and Markell's useful analysis is not exhaustive of the facts and circumstances that may rebut a presumption of unfair discrimination. Under the facts of this case, the holders of Class A6 were not harmed by the disparate recovery provided to Trade and Business-Related Claims, and all unsecured creditors did significantly better than they would have outside of chapter 11 or under a plan of liquidation. To the extent the Bankruptcy Court did not specifically address the Markell bases for rebuttal in its bench ruling, Appellant cites no case law in support of such a limited, formulaic application. The Bankruptcy Court's analysis is consistent with the Markell analysis undertaken in *Genesis I*. I find no error in the Bankruptcy Court's conclusion that the Plan did not unfairly discriminate, which is based on uncontroverted, case-specific facts and consistent with applicable case law and legislative history concerning unfair discrimination.

### 2. The Third Circuit Has Not Foreclosed Horizontal Gifting, and the Vertical Gifting Cases Cited by Appellant Are Inapposite

In determining that the Plan did not unfairly discriminate, the Bankruptcy Court relied on *Genesis I*, a case with virtually identical facts, which examined whether a horizontal gift – like the one at issue in this case – unfairly discriminated against other classes. (7/24/17 Hr'g Tr. at 10:12-12:12). As noted above, in *Genesis I*, senior creditors who were not being paid in full shared a portion of their distributions with junior classes (Classes G4 and M4) but not with creditors holding punitive damages claims (Classes G7 and M7). *See Genesis I*, 266 B.R. at 612. There, the Bankruptcy Court held that "the disparate treatment between Classes G4 and G7 and Classes M4 and M7 is a permissible allocation by the secured creditors of a portion of the distribution to which they would otherwise be entitled, rather than unfair discrimination against [dissenting classes] by

the proponents of the plan." *Id.* Here, the Bankruptcy Court found "this situation [i.e., the Plan] to be consistent with the gift contained in the plan proposed in *Genesis*, which the *Armstrong* court viewed favorably." (7/24/17 Hr'g Tr. at 10:16-19).

Appellant argues that the Bankruptcy Court's approval of the Plan was erroneous, as "multiple appellate courts have held that a plan may not use gifting to circumvent § 1129(b)'s express provisions" in rulings following *Genesis I,* including the *Armstrong* decisions in this circuit. (*See* D.I. 29 at 22-30). Reorganized Debtors distinguish "vertical gifting" from "horizontal gifting." They argue that any "[n]egative treatment of gifting in the caselaw applies [only] to vertical gifting, which violates the absolute priority rule, a different provision of the Bankruptcy Code implicating different concerns." (D.I. 37 at 25-28). "The absolute priority rule, as codified, ensures that 'the holder of any claim or interest that is junior to the claims of [an impaired dissenting] class will not receive or retain under the plan on account of such junior claim or interest any property.'" *Armstrong II,* 432 F.3d at 513 (quoting 11 U.S.C. § 1129(b)(2)(B)(ii)). Reorganized Debtors argue that the absolute priority rule is not implicated here, as "there is no higher priority dissenting creditor being deprived of a gift (*i.e.*, no class skipping) because equity, which is the class junior to Class A6, received no distribution under the Plan." (D.I. 37 at 25). Contrary to Appellant's contention that gifting has been "flatly rejected" in this circuit, Reorganized Debtors argue that the Third Circuit in *Armstrong II* purposefully carved out *Genesis I's* horizontal gift ruling from its decision prohibiting vertical gifting in violation of the absolute priority rule. (*See id.*)

The Court agrees with Reorganized Debtors that *Armstrong II* did not "flatly reject" the concept of gifting. *Armstrong II* considered whether vertical gifting violated the "fair and equitable" requirement for cram-down, which invokes the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii). The Third Circuit concluded – based upon its consideration of the absolute

priority rule, not any consideration of whether there was "unfair discrimination" – that the distribution of warrants to equity holders, which skipped over an objecting class of unsecured creditors, violated the absolute priority rule. *See Armstrong II*, 432 F.3d at 513. "Under the statute, a plan is fair and equitable with respect to an impaired, dissenting class of unsecured claims if (1) it pays the class's claims in full, or if (2) it does not allow holders of any junior claims or interests to receive or retain any property under the plan 'on account of' such claims or interests." *Id.* at 512 (citing 11 U.S.C. § 1129(b)(2)(B)(i)-(ii)). The Third Circuit concluded that the plain language of the statute makes clear that a plan cannot give property to junior claimants over the objection of a more senior class that is impaired, and noted that "section 1129 was at least designed to address 'give-up' situations where a senior class gave property to a class junior to the dissenting class." *Id.* at 513.

Unlike that case, the gift at issue here does not involve vertical class skipping as it does not provide a distribution to a class junior to the dissenting Class A6. As the Bankruptcy Court noted,[15] *Armstrong I* also distinguished *Genesis I* on the facts as involving a distribution of property subject to the senior creditor's liens that was "carved out" voluntarily for junior claimants. *See Armstrong I*, 320 B.R. at 539. The Third Circuit adopted this reading of that case in *Armstrong II*, characterizing the *Genesis I* decision as having allowed a secured creditor to "(1) give up their proceeds under the reorganization plan to holders of unsecured and subordinated claims, without including the holders of punitive damages in the arrangement, and (2) allocate part of their value under the plan to the debtor's officers and directors as an employment incentive package." *Armstrong II*, 432 F.3d at 513-14; *see also In re World Health Alternatives, Inc.*, 344 B.R. 291, 298-

---

[15] The Bankruptcy Court noted in its bench ruling that *Armstrong* had distinguished the very similar "arrangement in *Genesis [I]* as an ordinary carve-out of the senior creditor's lien for the junior claimant's benefit" but did not reject it. (*See* 7/27/17 Hr'g Tr. at 11:8-12:9).

99 (Bankr. D. Del. 2006) (discussing *Armstrong II* and *Genesis I* and concluding that *Armstrong II*

distinguished, but did not disapprove of, *Genesis I*, and that secured creditors may give up a portion

of their lien for the benefit of junior creditors without violating the Bankruptcy Code). *Armstrong I*

reviewed relevant case law, including *Genesis I*, *In re MCorp. Financial, Inc.,* 160 B.R. 941 (S.D.

Tex. 1993), and *In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993), and rejected a blanket rule

that all gifting is permissible. *Armstrong I*, 320 B.R. at 539-40. The Third Circuit agreed:

> We adopt the District Court's reading of [the *MCorp-Genesis I* line of] cases, and agree that
> they do not stand for the unconditional proposition that creditors are generally free to do
> whatever they wish with the bankruptcy proceeds they receive. Creditors must also be
> guided by the statutory prohibitions of the absolute priority rule, as codified in 11 U.S.C. §
> 1129(b)(2)(B).

*Armstrong II*, 432 F.3d at 514. Reorganized Debtors do not advance a blanket rule that all gifting is

permissible. Reorganized Debtors' position is merely that "courts in this circuit have held that such

a horizontal gift is not unfair discrimination against the class that does not receive the larger gift

when (i) the creditor that does not receive the larger gift is not entitled to a distribution under a plan,

and (ii) no class junior to the creditor receives a distribution under the plan." (D.I. 37 at 12-13).

The horizontal gifting in *Genesis I* does not violate the absolute priority rule and remains good law.

Appellant cites several cases in support of his argument, but because they are vertical gifting

cases, they do not change the outcome here. Appellant cites *In re ICL Holding Co., Inc.*, 802 F.3d

547 (3d Cir. 2015), but that case addressed priority skipping payments in violation of the absolute

priority rule and did not address issues of unfair discrimination. (*See* D.I. 29 at 24). Appellant also

relies on the *DBSD* case from the Second Circuit. *See Dish Network Corp. v. DBSD N. Am., Inc.*

(*In re DBSD*), 634 F.3d 79, 86-87 (2d Cir. 2011). That case also involved a class-skipping gift to a

class junior to the dissenting creditor in violation of the absolute priority rule. The Second Circuit

held that the gifting of shares and warrants by second lien secured creditors to the debtor's sole

shareholder was impermissible where the company's general unsecured creditors did not receive full satisfaction of their claims. *See id.* at 87. In short, these decisions focus on vertical class skipping in violation of the absolute priority rule and do not support Appellant's argument that the gifted distributions in this case are impermissible.

Appellant cites just one case addressing horizontal gifting, *In re Sentry Operating Co. of Texas*, 264 B.R. 850 (Bankr. S.D. Tex. 2001), which as Reorganized Debtors correctly argue, is nonbinding and factually distinguishable. There, the plan sought to pay trade claims in full, while providing only a *de minimis* distribution to other general unsecured creditors. *See id.* at 851. In finding unfair discrimination, the *Sentry* court also emphasized that the secured lender was controlled by a competitor of the debtors, and that a large portion of the trade claims to be paid were to parties with "whom [the secured lender's] parent does substantial business." *Id.* at 856. Although the *Sentry* court concluded that there was a presumption of unfair discrimination, and stated that a secured creditor should not be permitted to "decide which creditors get paid and how much those creditors get paid" (*id.* at 865), the presence of a possible conflict of interest was evident. The *Sentry* court noted that the class of trade claims to be paid included creditors who "appear to be paid for reasons other than preservation of value." *Id.* at 864.

### 3. The Bankruptcy Court Did Not Err in Finding a Rational Basis for Separate Classification of Class A6 Claims

Section 1122(a) of the Bankruptcy Code provides that, except as otherwise provided in § 1122(b) of the Bankruptcy Code, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). "Section 1122 of the Code provides that claims that are not 'substantially similar' may not be placed in the same class; it does not expressly prohibit placing 'substantially similar' claims in separate classes." *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D.

Del. 2004). Courts have held that there is significant flexibility in classifying claims and interests into different classes as long as a rational legal or factual basis for separate classification exists and all claims or interests within a particular class are substantially similar. *See, e.g.*, *Jersey City*, 817 F.2d at 1060-61 (approving classification of general unsecured creditors into separate classes of doctors' indemnification claims, medical malpractice claims, employee benefit claims, and trade claims). "[I]n analyzing whether claims within a given class are substantially similar, the focus of the classification should be on the legal character of the claim as it relates to the assets of the debtor." *In re W.R. Grace & Co.*, 475 B.R. 34, 109-10 (D. Del. 2012), *aff'd*, 729 F.3d 332 (3d Cir. 2013) (internal citations and quotation marks omitted). The "primary analysis centers upon the legal attributes of the claims and not upon the status or circumstances of the claimant. Emphasis is not upon the holder so much as it is upon that which is held." *In re FF Holdings Corp.,* 1998 U.S. Dist. LEXIS 10741, *13 (D. Del. Feb. 17, 1998) (quoting *In re Northeast Dairy Cooperative Fed., Inc.,* 73 B.R. 239, 250 (Bankr. N.D.N.Y. 1987)). In determining whether the separate classification of substantially similar claims is permissible, "[i]t is a well-recognized principle that the classification of claims or interests must be 'reasonable' and cannot be grouped together for arbitrary or fraudulent purposes." *W.R. Grace*, 475 B.R. at 110.

Addressing Appellant's argument that the Plan improperly classified his claims separately from other general unsecured claims, the Bankruptcy Court noted that the proper analysis "focused on how the legal character of the claim relates to the assets of the debtor and whether the claims exhibit a similar effect on the bankruptcy estate." (7/24/17 Hr'g Tr. at 5:23-25). Based on the character and effect of the claims, the Bankruptcy Court found the Plan's separate classification of those claims to be reasonable and based on a "justifiable rationale:"

[T]he debtors are entitled to flexibility in classifying claims [and] interests into different classes so long as a rational[], legal, or factual basis for separate classifications exists and all claims or interest[s] within a particular class are substantially similar.

On[e] such justifiable rationale for separately classifying certain trade creditors from others is the debtors' intention of a continuing business relationship with such trade creditors as here. In its submissions, the debtors clearly explain that separate classification is necessary to maintain ongoing business relationships that [t]he debtors need to ensure the continuance of operations.

In *Coram*, the Bankruptcy Court determined that separate classification of unsecured noteholders and trade creditors was reasonable because each group represented a voting interest that was sufficiently distinct from one another to merit a separate voice in the reorganization.

Here, I similarly find that the plan reasonably classifies the 2018 noteholders separately from the other unsecured claims including intercompany claims, other general unsecured claims, and [what] I'll refer to as litigation claims including tort and disputed contract claims, all related to activities arising out of day-to-day operations of the companies.

(*Id.* at 6:1-24).

Appellant argues on appeal that "[t]he purported justification for separate classification [of those substantially similar claims] – that is, note claims on the one hand versus claims 'arising out of day-to-day operations,' on the other – does not pass muster under the law." (D.I. 29 at 31-32). Appellant argues that litigation claims being paid in full include liabilities arising out of "negative outcomes," including "lawsuits involving employment, commercial, and environmental issues, other claims for injuries and damages, and various shareholder and class action litigation, among other matters." (*See* D.I. 29 at 34 (citing 7/21/17 Hr'g Tr. 40:1-42:6)). "Other than saying that those claims arose from 'day-to-day operations,' the Bankruptcy Court failed to identify any business reason for paying those litigation claims in full, while simultaneously paying holders of the 2018 Notes Claims received less than 10 cents on the dollar." (*Id.*) According to Appellant, "It is difficult to fathom what possible business reason could exist." (*Id*). Conversely, Reorganized Debtors argue that the Bankruptcy Court correctly found that fostering the Debtors' reorganization formed a rational basis for separate classification of the Trade and Business-Related Claims. (*See*

D.I. 37 at 14-15). "Creditors holding Trade and Business-Related Claims were paid in full in recognition of the impossibility of partially impairing them during an expedited case, the relatively small amount that this body of creditors represents, and their importance to the smooth operation and success of the Debtors' business." (*Id.* at 36-37).

Numerous cases permit separate classification of trade claims from noteholder claims on the grounds that such claims have different legal attributes. In *Coram*, the chapter 11 plan separately classified trade creditors from other unsecured claims, including noteholder claims, and the noteholders argued that such separate classification of substantially similar claims was improper. *See Coram*, 315 B.R. at 348-49. The court found that the legal attributes of the noteholder claims were different from the trade claims because the noteholder claims "arose from the purchase of notes, not the provision of services to the [d]ebtors" like the trade claims. *See id.* at 349. Accordingly, the court concluded that the claims were not substantially similar and that separate classification was proper. *Id.* at 351 ("[W]e are convinced that the Noteholders do represent a voting interest that is sufficiently distinct from the trade creditors to merit a separate voice in this reorganization case."). As in *Coram*, the Plan here permissibly classified claims arising from the purchase of the 2018 Notes separately from claims arising from the Debtors' operations and businesses, Classes A7, B7, and C7. Claims in Class A6 (2018 Note Claims) are legally distinct in nature from claims in the other classes of general unsecured claims. Creditors in Class A6 derive their claims from the 2018 Note indenture, a single debt instrument governing the 2018 Notes. In contrast, the holders of claims in Classes A7, B7 and C7, containing Trade and Business-Related Claims, all have claims that arose in connection with the Debtors' business operations, not indentures or similar financial instruments, including certain contingent litigation claims related to the Debtors' operations and businesses.

Reorganized Debtors further cite decisions by "[n]umerous courts [that] have held that separate classification and treatment of trade claims is acceptable if the separate classification is justified because they are essential to a reorganized debtor's ongoing business."[16] Appellant disputes this argument, arguing that the separate classification was motivated "solely for the discriminatory purpose of not having to pay holders of the 2018 Notes Claims in full." (D.I. 29 at 14). However, Appellant's only argument in support of discriminatory purpose is circular: essentially, that the separate classification otherwise "makes no sense." (*See id.* at 33). "The origin of a given unsecured claim has nothing to do with whether a business reason exists for providing that claim with better treatment going forward." (*Id.*). Appellant's argument regarding discriminatory purpose is unavailing. The Bankruptcy Court's decision rested on its finding that the separate classification of trade creditors from noteholders fosters the reorganization. This finding is supported by the record, including Debtors' CRO's confirmation hearing testimony that the separate classification and treatment of the Trade and Business-Related Claims was necessary (i) to "preserve what little trade credit the company did have remaining," (ii) because the businesses are typically operated in smaller towns with limited vendors, and (iii) because not paying any particular

---

[16] *See, e.g., Coram*, 315 B.R. at 349 (approving separate classification of trade creditors from other unsecured claims, including noteholder claims); *Jersey City Med. Ctr.*, 817 F.2d at 1061 (upholding separate classification of trade creditors as reasonable because of the differences between physician claims, medical malpractice claims, employee benefit claims, and trade creditor claims); *FF Holdings,* 1998 U.S. Dist. LEXIS 10741, at *16 (finding that separate classification of trade claims is permitted "if the separate classification in the other unsecured claims class"); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 247 (Bankr. S.D.N.Y. 2007) (finding it was within the debtor's discretion to separately classify the trade claims from other unsecured claims because the trade claims reserves would be shielded from the risk of certain of the unliquidated claims in the other unsecured claims class); *In re Richard Buick, Inc.*, 126 B.R. 840, 852 (Bankr. E.D. Pa. 1991) (upholding full payment of trade claims but only 5% recovery for other unsecured claims because full payment of the trade claims was necessary to the future success of the debtor's business).

vendor would likely tarnish the reputation of the Debtors and harm relationships with other current or future potential vendors. (7/21/17 Hr'g Tr. 60:24-62:5; *see also* B.D.I. 338 at ¶ 37). Nothing in the record indicates that Appellant's claims were placed in Class A6 for arbitrary or fraudulent purposes, which is also belied by the Class A6 vote.[17] The Court finds no error in the Bankruptcy Court's determination that a rational basis for separate classification exists and that the classification was reasonable.

## V.     CONCLUSION

The Plan has been substantially consummated, and there is no practical relief that could be granted to Appellant that would not violate express provisions of the Bankruptcy Code, fatally scramble the Plan, and significantly harm third parties who have justifiably relied on plan confirmation. Therefore, the appeal meets the criteria for equitable mootness. Alternatively, the Bankruptcy Court's ruling is consistent with existing precedent, and the Confirmation Order is affirmed.

A separate order will be entered.

---

[17] The record reflects that, of the holders of Class A6 claims who voted on the Plan, approximately 80% in number voted to accept the Plan. (*See* B.D.I. 154, A746 (voting declaration)).